UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

TIMOTHY FAGAN,                                        **FIRST AMENDED**
                                                     **COMPLAINT**


                              Plaintiff,

            -against -                                CV-03-3787 (SJF)(WDW)


AMERISOURCEBERGEN CORP.,

AMGEN INC., CVS CORPORATION, PROCARE

PHARMACY, INC., and JOHN

DOE CORPORATIONS 1 – 100 (fictitious names for       Jury Trial Demanded

Corporations who manufactured, distributed, or sold

the drugs that are the subject of this suit and the

containers the drugs were packaged and/or shipped

in),

                              Defendants.

-------------------------------------------------------------X


       TIMOTHY FAGAN, as and for his First Amended Complaint against Defendants,
alleges as follows:


<u>Nature of the Action</u>


  1. TIMOTHY FAGAN brings this action to recover for personal injuries suffered in Suffolk

County, New York.  The injuries were caused by the repeated injection of a counterfeit drug,

Epogen, into his body. The drug was manufactured by AMGEN, went through wholesale

distribution by AMERISOURCEBERGEN and was then sold to CVS and its ProCare subsidiary

for final sale to the Plaintiff. The drug was prescribed in March, 2002, after TIMOTHY FAGAN

had a liver transplant when he was 16 years old.  The Epogen was designed to boost his anemic

condition by stimulating the production of red blood cells.  The weekly injections of counterfeit

1

medication continued for two months before discovery that the medications he was receiving were counterfeit. TIMOTHY FAGAN suffered a continued anemic condition, delayed recovery from his liver transplant, excruciating side effects from the injections,  risk to his life and unknown permanent consequences.

The Parties

2.   TIMOTHY FAGAN resides in the State of New York, County of Suffolk.  On July 27, 2003, he turned 18 years of age.

3.   Defendant AMERISOURCEBERGEN CORP. (hereinafter "ABC") is a Delaware corporation with its principal place of business in Pennsylvania that is traded on the New York Stock Exchange under the ticker symbol "ABC".

4.   ABC is a wholesale distributor of pharmaceuticals, some of which it purchases from manufacturers and some of which it purchases from secondary sources.

5.   Defendant AMGEN, INC. (hereinafter "AMGEN") is a Delaware corporation with its principal place of business in California that is traded on the New York Stock Exchange under the ticker symbol "AMGN".

6.   AMGEN manufactures Epogen.

7.   Defendant CVS CORPORATION (hereinafter "CVS") is a Delaware corporation with its principal place of business in Rhode Island that is traded on the New York Stock Exchange under the ticker symbol "CVS".

8.   Defendant PROCARE PHARMACY, INC. (hereinafter ProCare), is a Rhode Island corporation with its principal place of business in Rhode Island.

9.   ProCare is a subsidiary of CVS. CVS and ProCare are collectively referred to in this Amended Complaint as "CVS ProCare". CVS ProCare, among other things, sells and delivers medications to consumers.

10. CVS ProCare purchased the counterfeit Epogen from ABC then sold and delivered it to TIMOTHY FAGAN.

11. DOE CORPORATIONS 1 – 100 are fictitious names for Corporations who manufactured, distributed, or sold the drugs that are the subject of this suit and the containers the drugs were packaged and/or shipped in.

12. The defendants are in the business of the manufacture, distribution, or sale of pharmaceutical products and related healthcare services to the public.

<u>Jurisdiction and Venue</u>

13. This Court has jurisdiction over this matter pursuant to 28 USC 1332 in that TIMOTHY FAGAN is a citizen of the State of New York, defendants are incorporated under the laws of another state and have a principal place of business in another state.  The matter in controversy exceeds the value of $75,000, exclusive of interest.  Plaintiff further invokes the pendant and/or supplemental jurisdiction of this Court to hear and decide claims arising under state law.

14. This Court has personal jurisdiction over the defendants in that, among other things, defendants were systematically and continuously doing business in the State of New York as defined by CPLR §301.

15. Further, this Court has jurisdiction pursuant to New York's long arm statute, CPLR §302.

<u>Facts, Corporate Allegations and Medical Background</u>

16.  Epogen is a drug manufactured exclusively by AMGEN.

17.  Epogen is designed to treat anemia.

   a.  Anemia is a decrease in the number of red blood cells, which carry oxygen throughout the body. The amount of red blood cells one has depends on a hormone called erythropoietin, which is produced by the kidneys. Erythropoietin instructs bone marrow to make red blood cells. Diseased or damaged kidneys may not make enough erythropoietin. As a result, red blood cell levels drop and anemia may result.
   b.  One who suffers from anemia may feel tired and weak, and may lack energy most of the time. Even mild exercise may bring on fatigue, difficulty in breathing and, sometimes, chest pain. Although dialysis makes up for the loss of some kidney functions, it does not correct anemia.
   c.  Epogen is a drug that is a copy of the erythropoietin that is naturally produced by healthy kidneys. It works in the same way and has the same effects as the naturally produced erythropoietin, and helps correct anemia in dialysis patients.
   d.  Epogen works the same way as naturally produced erythropoietin. It causes bone marrow to make red blood cells. These red blood cells carry oxygen throughout the body.

18. TIMOTHY FAGAN, age 16 at the time, had a liver transplant at New York University Medical Center on or about February 15, 2002.  He was thereafter prescribed Epogen by his physician for an anemic condition, at a dosage of 40,000 units per milliliter, to be injected once a week.

19. On or about March 20, 2002, TIMOTHY FAGAN received a first shipment of Epogen from CVS ProCare, labeled as containing 40,000 units per milliliter, and was subsequently injected with the drug on a weekly basis.

20. In mid-April, 2002, a second lot of Epogen was delivered by CVS ProCare, bearing Lot # P0010191 (Exp. 09/02), labeled as containing 40,000 units per milliliter, which was administered to TIMOTHY FAGAN on a weekly basis.

21. In a letter dated May 8, 2002, addressed to **"Dear Health Care Professional"**, and posted on the AMGEN website (http://wwwext.amgen.com/news/news02/release020506.html), AMGEN stated that there was counterfeit Epogen in the marketplace. The counterfeit Epogen bore lot number P002970 (Exp. 7/03).  The letter stated that the vial label should read "Store at 2° to 8° C" and that the counterfeit could be determined by examining the vial label. On the counterfeit vial, the degree sign was missing from the storage temperature.

22.  Epogen must be stored between 36º and 46º F. (2º and 8º C.) and can break down simply by being shaken excessively.

23. AMGEN claimed in the May 8, 2002 letter that the counterfeit drug contained the active ingredient, but at a dosage that was 1/20 the strength set forth on the label.

24. On or about May 14, 2002, CVS ProCare called TIMOTHY FAGAN to inform him that there was counterfeit Epogen in the marketplace.

25. On or about May 15, 2002, CVS ProCare delivered to TIMOTHY FAGAN a third lot of Epogen, bearing Lot # P002970 (Exp. 07/03), which was the lot designated as counterfeit by AMGEN in the May 8, 2002 letter.

26. On or about May 20, 2002, TIMOTHY FAGAN learned that the second shipment of Epogen to him, received in mid-April and previously administered to him on a weekly basis, bearing lot number P001091 (Exp. 09/02), was also missing the degree symbol for the storage temperature on the label.

27. Upon learning that lot # P001091 was also missing the degree symbol, Kevin Fagan, TIMOTHY FAGAN 's father, informed the Food and Drug Administration and AMGEN that this may be a second lot of counterfeit drug.

28. On or about May 24, 2002, after learning from Kevin Fagan of the missing degree symbol on lot P001091, AMGEN identified this lot as counterfeit.

## The Gray Market

29. ABC is a wholesale distributor that buys Epogen from AMGEN and then sells it to pharmacies.

30. ABC is an "authorized distributor" of AMGEN.

31. ABC also bought Epogen and other medications from secondary sources that were not manufacturers. These secondary sources constitute a "Gray Market".

32. At all times herein, Defendants knew, or should have known, that drugs sold on the Gray Market include diverted drugs. Diverted drugs are those that have been stolen from hospitals, pharmacies and doctors offices, have been illegally imported from foreign countries where they are made more cheaply and under less stringent standards than in the United States, have been obtained from Medicaid recipients, some of which are sold on the street in exchange for illegal street drugs, and from other illegitimate sources. These findings were documented by the First Interim Report Of The Seventeenth Statewide Grand Jury of the State of Florida, February, 2003, all of which is incorporated by reference as though set forth at length herein.

33. Defendants knew, or should have known, that diverted drugs usually wind up being counterfeited or re-labeled before being sold to corrupt secondary wholesalers. Once in the hands of these wholesalers, the drugs are often further adulterated by being mishandled and improperly stored.

34. Upon information and belief, ABC purchased counterfeit Epogen on the Gray Market that was ultimately injected into TIMOTHY FAGAN.

35. The counterfeit Epogen  injected into TIMOTHY FAGAN was sold by ABC (or a subsidiary or affiliate under its control) to CVS ProCare (or a subsidiary or affiliate under their control).

36. CVS ProCare sold the counterfeit Epogen that it had obtained from ABC to TIMOTHY FAGAN.

37. Amgen was aware, should have been aware, or failed to make reasonable inquiry to determine whether Epogen was being sold on the Gray Market or otherwise being diverted from reputable sources.

38. CVS ProCare knew, should have known, or failed to make reasonable inquiry to determine that ABC purchased Epogen on the Gray Market.

39. AMGEN knew, should have known, or failed to make reasonable inquiry to determine that ABC was purchasing drugs on the Gray Market and selling them as *bona fide* AMGEN drugs.

40. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it was unaware of its true "pedigree".  The pedigree of a medication is an accurate list of all purchasers and sellers of a medication from the manufacturer to the ultimate dispenser.

41. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it was unaware of how many hands the medication had passed through and unaware of the conditions under which it had been kept.

42. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it was unaware as to how the medication had been handled and stored and at what temperatures it had been kept.

43. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it was unaware of whether this medication had been previously stolen.

44. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it was unaware as to whether its prior owners had criminal records.

45. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it failed to make reasonable inquiry as to the people or companies that had previously owned or handled the drug, such as conducting reasonable background checks.

46. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it failed to make reasonable inquiry as to whether the medication had been transported and stored correctly and that it had not been tampered with, altered or otherwise adulterated.

47. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it was unaware as to whether this medication had expired.

48. At the time ABC purchased the counterfeit Epogen on the Gray Market that was eventually injected into TIMOTHY FAGAN, it had no knowledge as to the level of experience

or competency of those who had handled the drug from the time it left AMGEN to the time ABC purchased it.

49. ABC purchased Epogen of unknown pedigree for re-sale to the public because it was more profitable for ABC than buying Epogen with a known and properly documented pedigree

50. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it was unaware of its true pedigree.

51. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it was unaware how many hands the medication had passed through and unaware of the conditions under which it was kept.

52. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it was unaware as to how the medication had been handled and stored and at what temperatures it had been kept.

53. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it was unaware of whether this medication had been previously stolen.

54. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it was unaware as to whether its prior owners had criminal records.

55. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it failed to make reasonable inquiry as to the people or companies that had previously owned or handled the drug, such as conducting reasonable background checks.

56. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it failed to make reasonable inquiry as to whether the medication had been transported and stored correctly and that it had not been tampered with or otherwise altered.

57. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it was unaware as to whether this medication had expired.

58. At the time CVS ProCare purchased the counterfeit Epogen from ABC that was eventually injected into TIMOTHY FAGAN, it had no knowledge as to the level of experience or competency of those who had handled the drug from the time it left AMGEN to the time ABC purchased it.

59. CVS ProCare purchased Epogen of unknown pedigree for re-sale to the public because it was cheaper than buying Epogen with a known and properly documented pedigree.

60. The Defendants were all aware of the problem of the diversion of drugs by those with criminal intents and counterfeiting, since at least 1988, when Congress enacted the Prescription Drug Marketing Act (Public Law 100-293, signed into law April 22, 1988).  A key component of the Act is aimed at stopping the diversion of pharmaceutical drugs.

61. The Defendants were aware for many years that counterfeiters were engaged in fraud, mislabeling, misbranding and adulterating drugs, and aware of the existence of counterfeit pedigree papers.

62. Selling drugs of unknown pedigree is like buying an open bottle of medicine off the drugstore shelf.

63. ABC, at the time they sold the counterfeit Epogen to CVS ProCare that was ultimately injected into TIMOTHY FAGAN, failed to make reasonable efforts to trace the drugs back to the manufacturer.

64. CVS ProCare, at the time they sold the counterfeit Epogen to TIMOTHY FAGAN that he was ultimately injected with, failed to make reasonable efforts to trace the drugs back to the manufacturer.

65. TIMOTHY FAGAN was unaware at the time of the injections that the Epogen he was being injected with was counterfeit or adulterated.

## First Cause of Action – Negligence of ABC

66. TIMOTHY FAGAN repeats and realleges the allegations of each succeeding and preceding paragraph as though set forth at length herein

67. ABC, its subsidiaries, partners, servants, agents, and employees, acted negligently and with a reckless disregard for the health, well-being and safety of TIMOTHY FAGAN and other members of the public by: (a) purchasing Epogen on the Gray Market when it did not know who had handled the drug; (b) purchasing Epogen on the Gray Market without knowing if the prior owners and handlers of the drug had any education, training or specialized knowledge in the field of pharmaceuticals; (c) purchasing Epogen on the Gray Market when it did not know the circumstances under which it had been stored; (d) purchasing Epogen on the Gray Market when it did not know the temperatures at which it was stored; (e) purchasing Epogen of unknown pedigree for re-sale to the public; (f) risking the lives and safety of the public for corporate profit; (g) risking the life and safety of TIMOTHY FAGAN for corporate profit; (h) failing to require adequate pedigree papers for drugs it bought on the Gray Market; (i) failing to use due

diligence to guarantee the legitimacy of the drugs they were purchasing; (j) failing to use due diligence in verifying pedigree papers; (k) engaging in willful blindness with respect to drugs it was purchasing on the Gray Market; (l) falsely representing that the Epogen they were selling was *bona fide*; (m) falsely representing that the Epogen they were selling was as labeled; (n) causing, permitting and allowing the health, well-being and safety of TIMOTHY FAGAN and the public to be compromised and endangered; (o) buying, selling and otherwise trafficking in counterfeit medication in violation of federal law; (p) buying, selling and otherwise trafficking in counterfeit medication in violation of New York State law; (q) breaking, tearing or otherwise tampering with anti-counterfeiting devices placed on the packaging and vials so that pharmacies and patients would no longer have the benefit of such devices; (r) failing to inspect anti-counterfeiting labels and devices on the packaging to see if they were *bona fide* and; (s) causing, permitting and allowing TIMOTHY FAGAN to be injured.

68. ABC knew that others were trying to place fraudulent, adulterated, mislabeled or misbranded drugs into the marketplace.

69. Despite knowing that others were trying to place fraudulent, adulterated, mislabeled or misbranded drugs into the marketplace, ABC continued to purchase drugs of unknown pedigree.

70. ABC knew, or should have known, that selling drugs of unknown origin to the public was dangerous and that it was foreseeable that members of the public would be injured as a result.

71. ABC actively lobbied against laws that would require pedigree papers for drugs that are traded on the Gray Market.

72. As a result of the foregoing, TIMOTHY FAGAN was injected with counterfeit Epogen, suffered a continued anemic condition, delayed recovery from his liver transplant, excruciating

side effects from the injections, risk to his life and unknown permanent consequences, was rendered sick, sore, lame and disabled, suffered shock to his nervous system, suffered and continues to suffer emotional and psychological injury, was required to and did receive medical treatment for his injuries and may in the future be so required, was forced to expend various sums of money in an effort to cure himself and may in the future be so required, was prevented from attending to his usual duties and activities and may in the future be so prevented.

<u>Second Cause of Action – Negligence of AMGEN</u>

73. TIMOTHY FAGAN repeats and realleges the allegations of each succeeding and preceding paragraph as though set forth at length herein.

74. AMGEN knew that its drugs were being traded without proper pedigree papers on the Gray Market between wholesalers.

75. AMGEN failed to take reasonable steps to package Epogen in such a way as to make tampering with it easily detectable.

76. Despite the knowledge that Epogen was being traded in the Gray Market, and despite the knowledge that persons in the Gray Market frequently failed to properly handle and store Epogen, and despite the knowledge that improperly handled or stored Epogen rendered it dangerous to the ultimate consumer, who is frequently in an extremely fragile physical condition, AMGEN failed to take reasonable steps to prevent Epogen from being traded in the Gray Market and failed to take reasonable steps to package Epogen in such a way as to make tampering with it difficult, and to make such tampering or mishandling obvious to wholesalers, retailers, medical and pharmaceutical personnel and the ultimate consumer.

77. AMGEN permitted its authorized wholesalers to trade products bearing the AMGEN name on the Gray Market.

78. AMGEN failed to insist that its authorized wholesalers use proper pedigree papers when trading its drugs on the Gray Market.

79. AMGEN knew, or should have known, that ABC was buying drugs bearing the AMGEN name on the Gray Market and re-selling them as *bona fide* AMGEN product.

80. AMGEN continued to sell drugs to ABC after learning that it was dealing in the Gray Market.

81. AMGEN actively lobbied against laws that would require pedigree papers for drugs that are traded on the Gray Market.

82. AMGEN acted in such a fashion as to make it easier for counterfeiters and re-labelers to commit fraud with respect to drugs sold under the AMGEN name.

83. AMGEN, its subsidiaries, partners, servants, agents and employees, acted negligently and with a reckless disregard for the health, well-being and safety of TIMOTHY FAGAN and other members of the public by: (a) failing to insist that its authorized wholesalers properly use pedigree papers for the Epogen that is buys and sells; (b) permitting its authorized wholesalers to deal on the Gray Market in products labeled as AMGEN; (c) assisting its customers in obscuring the pedigree path of drugs that originated from AMGEN; (d) failing to protect the chain of possession of its drugs as they are sold and re-sold down the line from manufacturer to dispenser; (e) encouraging the existence of a Gray Market; (f) encouraging the Gray Market by selling drugs into the Gray Market at a significant discount to the wholesale price; (g) turning a blind eye to the counterfeiting and re-labeling of its drugs; (h) failing to take steps to insure that its product is not counterfeited; (i) permitting ABC to be an authorized wholesaler despite its

participation in the Gray Market; (j)  causing, permitting and allowing the health, well-being and safety of TIMOTHY FAGAN  and the public to be compromised and endangered; (k) and causing, permitting and allowing TIMOTHY FAGAN  to be injured.

84. AMGEN knew, or should have known, that others were trying to place adulterated or mislabeled drugs into the marketplace via the Gray Market.

85. Despite knowing that others were trying to place adulterated or mislabeled drugs into the marketplace, AMGEN continued to permit its authorized wholesalers to purchase drugs bearing the AMGEN name on the Gray Market.

86. Despite knowing that others were trying to place adulterated or mislabeled drugs into the marketplace, AMGEN continued to sell drugs into the Gray Market and encouraged its existence without taking steps to adequately safeguard its product.

87. Amgen knew, or should have known, that placing, or permitting its authorized wholesalers to place, drugs into the Gray Market under circumstances where the pedigree could not be properly tracked, was dangerous and that it was foreseeable that members of the public would be injured as a result.

88. As a result of the foregoing, TIMOTHY FAGAN was injected with counterfeit Epogen, suffered a continued anemic condition, delayed recovery from his liver transplant, excruciating side effects from the injections, risk to his life and unknown permanent consequences, was rendered sick, sore, lame and disabled, suffered shock to his nervous system, suffered and continues to suffer emotional and psychological injury, was required to and did receive medical treatment for his injuries and may in the future be so required, was forced to expend various sums of money in an effort to cure himself and may in the future be so required, was prevented from attending to his usual duties and activities and may in the future be so prevented.

<u>Third Cause of Action – Negligence of CVS PROCARE</u>

89. TIMOTHY FAGAN repeats and realleges the allegations of each succeeding and preceding paragraph as though set forth at length herein.

90. CVS ProCare and their subsidiaries, provide comprehensive pharmacy care to individuals on maintenance medications and other complex medication regimens.

91. ProCare is a subsidiary of CVS and is controlled by CVS.

92. CVS ProCare warranted and represented that its ProCare pharmacists are specially trained in high-risk conditions and highly skilled at helping consumers to manage complex medication therapies. In addition, it offered a variety of advanced services such as medication adherence monitoring, expert medication counseling, and drug interaction monitoring.

93. CVS ProCare, its subsidiaries, partners, servants, agents and employees, including but not limited to ProCare, acted negligently and with a reckless disregard for the health, well-being and safety of TIMOTHY FAGAN and other members of the public by: (a) purchasing Epogen for resale to its customers without properly verifying the pedigree of the drug; (b) agreeing to purchase Gray Market Epogen when it could not confirm who had handled the drug; (c) purchasing Gray Market Epogen when it did not know how it had been handled and stored; (d) purchasing Epogen of unknown pedigree for re-sale to the public; (e) buying Epogen from ABC with the full knowledge that ABC was dealing in Gray Market goods; (f) continuing to do business with ABC despite knowing that ABC was dealing in Gray Market goods; (g) failing to use due diligence with respect to checking the safety of drugs it was purchasing for resale; (h) warranting that the Epogen it had purchased was *bona fide* product without properly verifying its *bona fide* nature; (i) giving false assurances to TIMOTHY FAGAN that the Epogen it was

selling to him was the product he had ordered; (j) falsely representing that the Epogen it sold to TIMOTHY FAGAN was as labeled; (k) risking the lives and safety of the public for corporate profit; (l) risking the life and safety of TIMOTHY FAGAN for corporate profit; (m) causing, permitting and allowing the health, well-being and safety of TIMOTHY FAGAN and the public to be compromised and endangered; (n) buying, selling and otherwise trafficking in counterfeit medication in violation of federal law; (o) buying, selling and otherwise trafficking in counterfeit medication in violation of New York State law; (p) failing to check labels, seals or other devices on the Epogen boxes and/or vials that they were buying and selling to see if the goods had been tampered with; (q) breaking, tearing or otherwise tampering with anti-counterfeiting devices placed on the packaging and vials so that patients would no longer have the benefit of such devices; (r) failing to inspect anti-counterfeiting labels and devices on the packaging to see if they were *bona fide;* (s) and causing, permitting and allowing TIMOTHY FAGAN to be injured.

94. CVS ProCare knew, or should have known, that others were trying to place adulterated or mislabeled drugs into the marketplace.

95. Despite knowing that others were trying to place adulterated or mislabeled drugs into the marketplace, CVS ProCare continued to purchase drugs of unknown pedigree.

96. CVS ProCare knew, or should have known, that buying drugs without properly verifying their pedigree and selling them to their high risk customers was dangerous and that it was foreseeable that members of the public would be injured as a result.

97. As a result of the foregoing, TIMOTHY FAGAN was injected with counterfeit Epogen, suffered a continued anemic condition, delayed recovery from his liver transplant, excruciating side effects from the injections, risk to his life and unknown permanent consequences, was

rendered sick, sore, lame and disabled, suffered shock to his nervous system, suffered and continues to suffer emotional and psychological injury, was required to and did receive medical treatment for his injuries and may in the future be so required, was forced to expend various sums of money in an effort to cure himself and may in the future be so required, was prevented from attending to his usual duties and activities and may in the future be so prevented.

Fourth Cause of Action – Breach of the Implied Warranty of Merchantability by CVS ProCare

98.   TIMOTHY FAGAN repeats and realleges the allegations of each succeeding and preceding paragraph as though set forth at length herein.

99.   Plaintiff's doctor prescribed Epogen, at a dosage of 40,000 units per milliliter, for Plaintiff.  Plaintiff presented the prescription to CVS ProCare, and relied on CVS ProCare to fill the prescription as written.

100.      The agreement by CVS ProCare to fill the prescription as written was the basis of the bargain between the two.  Plaintiff would not have agreed to accept medications from CVS ProCare without their agreement to fill the prescription as written.

101.      CVS ProCare failed to fill the prescription precisely as written by TIMOTHY FAGAN's physician.

102.      CVS ProCare sold to TIMOTHY FAGAN vials of medication that were labeled as 40,000 units per milliliter with expiration dates as set forth previously in paragraphs 19 and 20 herein, but the contents of the vials delivered to FAGAN did not meet that description on the label.

103.      CVS ProCare warranted that the contents of the vials sold to TIMOTHY FAGAN, and set forth in paragraphs 19 and 20 herein, were as they were represented by their labels.  CVS

ProCare warranted that the vials contained Epogen, manufactured by Amgen, at a dose of 40,000 units per milliliter.

104.     CVS ProCare's Epogen was not of merchantable quality and not fit for the ordinary purposes for which such products are used.

105.     As a direct and proximate result of CVS ProCare's breach of warranty, TIMOTHY FAGAN was harmed as set forth above.

106.     As a result of the foregoing, TIMOTHY FAGAN was injected with counterfeit Epogen, suffered a continued anemic condition, delayed recovery from his liver transplant, excruciating side effects from the injections, risk to his life and unknown permanent consequences, was rendered sick, sore, lame and disabled, suffered shock to his nervous system, suffered and continues to suffer emotional and psychological injury, was required to and did receive medical treatment for his injuries and may in the future be so required, was forced to expend various sums of money in an effort to cure himself and may in the future be so required, was prevented from attending to his usual duties and activities and may in the future be so prevented.

<u>Fifth Cause of Action – Breach of Express Warranty by CVS ProCare</u>

107.     TIMOTHY FAGAN repeats and realleges the allegations of each succeeding and preceding paragraph as though set forth at length herein.

108.     CVS ProCare sold to TIMOTHY FAGAN vials of medication that were marked on the label as 40,000 units per milliliter with expiration dates as set forth previously in paragraphs 19 and 20 herein, but the contents of the vials delivered to TIMOTHY FAGAN did not match that description on the label.

109.     CVS ProCare's Epogen that was sold to TIMOTHY FAGAN, as described in paragraphs 19 and 20, was defective and unreasonably dangerous, as set forth above.

110.     CVS ProCare breached the express warranty on the label of the vials sold to FAGAN.

111.     As a direct and proximate result of Defendants' defective and unreasonably dangerous products and breach of the express warranty, TIMOTHY FAGAN was harmed as set forth above.

112.     As a result of the foregoing, TIMOTHY FAGAN was injected with counterfeit Epogen, suffered a continued anemic condition, delayed recovery from his liver transplant, excruciating side effects from the injections, risk to his life and unknown permanent consequences, was rendered sick, sore, lame and disabled, suffered shock to his nervous system, suffered and continues to suffer emotional and psychological injury, was required to and did receive medical treatment for his injuries and may in the future be so required, was forced to expend various sums of money in an effort to cure himself and may in the future be so required, was prevented from attending to his usual duties and activities and may in the future be so prevented.

<u>Damages</u>

113.     TIMOTHY FAGAN repeats and realleges the allegations of each succeeding and preceding paragraph as though set forth at length herein.

114.     Based upon the above, a jury could conclude that the Defendants knew of facts that created a high degree of risk of physical harm to the TIMOTHY FAGAN and that the defendants deliberately proceeded to act in conscious disregard or indifference to that risk, that

they acted with a reckless disregard for the health, well-being and safety of TIMOTHY FAGAN and other members of the public, and that therefore an award of punitive damages is warranted.

115.    As a result of the foregoing, TIMOTHY FAGAN has been damaged in an amount in excess of $75,000, and seeks punitive damages in the sum of one dollar for each share of stock issued and outstanding for each parent corporate defendant as of the date of the filing of this action for each defendant.

WHEREFORE, TIMOTHY FAGAN demands judgment in compensatory and punitive damages against the defendants together with the costs and disbursements of this action.

TIMOTHY FAGAN demands a trial by jury of all issues herein.

Dated:   New York, NY
             August 6, 2004

                          Yours, etc.,

                          _____
                          Eric Turkewitz (ET-3843)
                          *Attorney for Plaintiff*
                          99 Park Avenue - Suite 800
                          New York, NY 10016
                          (212) 983-5900